Mr. Ward. Good morning, Your Honor. May it please the Court, Joseph R. Ward Jr. on behalf of Clean Water Opportunities, Doing Businesses, EPS. This is a rather complicated antitrust matter. You may not find as complicated as it was to me. Well, you've sat here all morning. You see, we specialize in complicated. Absolutely. You know, that's what we do. Not a rare incollision. What we have here is a 12B6 motion that was granted by the District Court. Before I launch into the alleged facts, I wanted just to cover with the Court. I do a good bit of antitrust, and I know the case law says there's no heightened pleading standard, but I'm here to tell you the courts routinely look at it differently. I know what you say. I know what you put in here that, no, it's like any other case. What you put in your complaint is deemed to be true. Wasn't Iqbal an antitrust case? I'm sorry, Your Honor? Wasn't Iqbal an antitrust case? Yes. Your Honor, what I wanted to tell the Court is my burden is not heightened because I'm alleging an antitrust case. In fact, the courts, the Supreme Court specifically has said summary judgment, summary disposition should be very sparingly used in antitrust litigation. I mean, your point's well taken, but just hard for me to forget that Iqbal itself was an antitrust case, right? That's right, Your Honor. It's just sort of interesting to me you led off with the heightened pleading piece when Iqbal . . . I'm here to tell you I understand . . . Iqbal itself was an antitrust case, so go ahead, enter your . . . I didn't mean to distract you. The judge's point of view, I think you all do in the back of your minds look at it as a heightened thing, but the law is very clear you shouldn't do that and one of the reasons is because I don't have all the facts when I file this lawsuit. The facts are held by the defendants, particularly when it comes to the very, very discreet issues about what their cost of producing a product is. I won't know that until I have discovery. So the Supreme Court has advised the district courts and the appellate courts is hold off. Give them an opportunity to conduct discovery and that giving dismissals prior to discovery should be done very sparingly. Having said that, getting to what we're really here about, my client was in the patch business. That's the product. We've alleged the product in question is a polyurethane substance that they used to patch plywood. We've alleged a geographic market. We've explained to the court in our supplemental amending restated complaint exactly why the market, geographic market is the way it is. We've gone into great details to explain the barriers to enter that market. I've actually gone into historical context to show that the Willamette Valley Company, the defendant has a history of taking acts to get people out of the market. Remarkably, this is one of the few cases in my 41 year career where I have a 100% monopoly. I've alleged a 100% monopoly and the market power that a 100% monopoly brings to the table. That's very rare. Normally, we're up here arguing about the size of the geographic market because that really dictates what percentage of the market a defendant has. Here, they have a nationwide 100% monopoly. I'm alleging my client was involved in the southern market and that they have 100% there. I've gone into great detail about what they did to buy him out, to buy other companies out. They always attach a non-compete. We've alleged that after the non-compete ran out, he took a look at the numbers that he could get and he saw they were charging two or three times what they were charging back in the 90s where the cost had only gone up about 50% from his point of view. Having been in the market before, it's a little bit easier for him to get in the market and he did. One of the barriers to entry is in order to get the APA approval, you've got to go and produce some in a plant. It's not like you open up a lemonade stand and you lower your price a little bit and people come by and buy it. You've got to find a company that's willing to say, okay, we've got this big 800-pound gorilla out here who we buy our patch from. David, why don't you come in here in that corner over there, set up a shop, and maybe if you run some panels out, send it to the APA, they'll approve you. You can get your stamps on the stuff. It takes six weeks. The company that allows him to do this, according to our allegations, loses money when they do that. Why would they do that? Well, they found out. EPS got in, got to do it. APA approved it. He was charging a couple of dollars less than the other defendant was charging. That's competition. That is competition. Within a short period of time, EPS goes down to $12.95, which is substantially below what the defendants were charging. We've alleged, and the defendants make most of this, we've alleged that we can't compete, $10 and above, we can't compete below that. I have no idea today without looking at their documentation and having an expert really examine it, what their actual variable cost to produce a gallon of patch is. The court doesn't know. I don't know. All I can do is look at the smoke, look at what's happened, and make these facts, allege these facts, saying that what they did is they, to get rid of this company, they went to the company that had agreed to let him try and said, look, we'll knock down, we'll discount three or four other products. As long as you keep buying our patch, the judges can't compete. We're done. We're covered, and they did say we're covered for the long run. The judge looks at this and says, but I hear what you're saying, but why would they do that? That's not plausible for me that a company would sell its product below its average cost. That's what they did. Think about this. They're taking a loss at this one company and perhaps one of the others, we allege, but all over the United States they're still getting $17. They're making a huge profit. They could afford to give the patch away to get rid of my client as a competitor. They didn't have to go to just below $10. They could have given it away, and still they're going to make money. But for a claim under Section 2, for predatory pricing, there's some standards we have to allege product market. Predatory pricing that they lowered the price below the average incremental cost, their variable cost, and then that there has to be a showing or allegations that they had the plan was they were going to recoup these costs in the future. And one of the issues there is the reality. The court wants to see barriers to entry. In other words, how are they going to recoup their losses if anybody could just come along behind EPS and say, well, EPS didn't do it, but we're going to try it. We're going to come in at $10.50. Let's see how we do. That's why it was so important for us to allege the barriers to entry, numerous, half a dozen barriers to entry, the most significant of which is Willamette has a 100% monopoly. When we go to talk to these companies, as we allege, one company we're dealing with just says, no, it's not going to work. After Willamette finds out we're going to a third mill to pitch our wares, they say no. What are the barriers to entry? This is a highly technical chemical. You can't buy it off the shelf. The application materials, the tools, you can't buy them. Willamette doesn't sell them. They're not going to tell you how to make them. The owner of EPS knew how to make them, and he put it together. What he saw is he could improve on what was existing because they haven't bothered to improve their equipment in 20 years because they have a monopoly. The judge looked at that, and he said, well, I don't think it's plausible that a company would want to lose money, and you haven't really told me what their costs are. I can't tell him what the costs are until the discovery. I can only look and allege what we see. He says, well, then, but on the barriers to entry, I just don't think those are legally significant. In our brief, we go into great detail. I think it's page 33, 35, all the case law where the courts have said licensing requirements are barriers to entry. Control of essential or superior resources are barriers. We've alleged all this. The courts have said entrenched buyer preference is a barrier. Where you have an 800-pound gorilla as your competitor, that is a barrier to you stepping in. Economies of scale, they sell all over the country. They can buy stuff cheaper. That's an entry to barrier. We've alleged all of those facts. The judge just, actually, the judge is a friend of mine, and he just said, I just don't think that's legally significant. He just did not believe the allegations. I found it, it was, I didn't understand it. At one point in time, he did ask us, well, would you give me an amendment and give me some more information? He asked about an entry to barrier. He asked about product substitutes, because that's usually another argument we get into, whether there's alternative products. We went to great detail to point out to him there are no substitutes. There are numerous barriers to entry, and we listed them all. Then he said, well, tell me how, what they did was illegal, and we pointed out to him in our amended complaint. You can't engage in predatory pricing for the purpose of running someone out of business. That is an illegal practice. He goes back to, well, it just doesn't seem plausible to me that they would do that. We had another cause of action, actually, under Clayton, Section 7 of the Clayton Act, because after we were put out of business, we still had the equipment. Somebody could have used it and started competing with them. The owner, one of the officers of Willamette, as we allege, was contacted. He said, let me look into it. My client asked him, why did you put me out of business? He contacts us. The company contacts EPS and says, well, we want to buy all that equipment. They don't need the equipment. They don't need it at all. Why would they buy the equipment? Then they say, well, not only do we want your equipment, but if we're going to buy this equipment, which is of no use to my client, you have to sign another non-compete. Under Section 7 of Clayton, you can't buy another company for the purpose of maintaining your monopoly. It's clear they did that. It's absolutely crystal clear from our allegations. If you accept them as truth, they're liable. We also allege another violation of Section 2, which is along the same lines. You undertake acts to maintain your monopoly. The judge goes back and says, well, if I found that there was no predatory pricing, I don't see how they could possibly have been engaged in any competitive conduct. We allege any competitive conduct beyond just the predatory pricing. The acts of maintaining your monopoly with any competitive conduct doesn't have to be illegal or criminal. It's just the way you unreasonably relate to your competition. You go to these retailers and you tell them, these manufacturers, you say, if you don't use our product, we're done. That had to have happened. Otherwise, my client wouldn't have gotten calls saying, we're not even talking to you anymore. We've alleged these facts. And then we also allege this constitutes a violation of the Louisiana Antitrust Statutes. But I do admit that if there's no violation of the federal, there wouldn't be no violation of the state. It basically tracks the Sherman Act. So, Your Honors, I don't know what else I could say to this judge, to this court now with the de novo review. We've made the allegations of fact. If they're accepted as true, this company has violated the Antitrust Statutes on multiple different ways. It's as simple as that. Unless the court has any question, I'll reserve the remainder of my time. All right. Thank you, Your Honor. All right. Let's hear from counsel opposite, Mr. Hoffman. Good morning, Your Honors. Rob Hoffman for Willamette. May it please the court. I'll begin, Chief Judge Stewart, with where you began. And it's the pleading standard. The pleading standard requires plausibility. I think actually it's Twombly. That's the antitrust case. It's the parallel conduct case. Iqbal, I think, was an immigration case. But they make the same point. And the point is this. And just stepping back for a minute about antitrust law. Competition, normal competition, often involves a lot of people. Involves driving people out of business. Involves harm to competitors. And the antitrust laws should not be understood to allow losing parties to come in and plead the bare elements of a claim without any factual basis to believe that those elements, which are really just legal conclusions disguised as factual allegations, but plead those bare elements of the claim and then impose what amounts to a litigation tax on competitive conduct. And that's exactly what the district court here saw happen. This is a predatory pricing case. And this is a case that begins with the question, well, did, are there allegations in this complaint sufficient to lead, to make it plausible that Willamette responded to the competition from EPPS by pricing its patch below cost? And let's look at what the factual context of the cases talk about, say, about price. The factual context, as counsel just explained, was that they came in and proposed $12.90 a gallon. They also allege, so they have enough information, forget about our costs for a moment, they have enough information about costs to understand that you can profitably sell, or to allege that you can profitably sell patch at $10 a gallon. So they come in and they price about 30% above a price that is a profitable and sustainable price for patch. And they have nothing else. They have nothing else except paragraph 40 of the complaint, which is a conclusory allegation that we respond to a price that's 30% above a profitable competing price by going, blowing past that competitive price all the way to below average variable cost. And what we're, what the district court observed, rightly, in our view, is that that's utterly implausible. It makes no sense. And it doesn't even stop there. Because remember, in paragraph 38 of the complaint, what they say is MarCO didn't just get a better price from us, it got a better price over the long term. So now you have to conclude that we responded to a price 30% above a plausible with a large customer, because MarCO has 20% of the market. And then the kicker is, they allege, in paragraph 44 of the complaint, that we offered similar deals to Hood and Coastal Plywood. So now, in response, again, this is how implausible this gets. In response to a price that's almost 30% above a profitable competing price, we blow past that profitable competing price, take a loss, long term, on something even greater than 20% of the market. Now with all due respect, I think the district court was right to say that is utterly implausible. And in fact, if you understand what the plausibility standard is there for, it makes perfect sense to say that you have to allege more than that. Because in the Twombly case, the Twombly case was about parallel conduct. Another situation where conduct of competitors moving in parallel, responding to price movements and the like in parallel, that's actually what you'd expect in a functioning competitive marketplace. And what you don't want to have is antitrust law that basically says, whenever you have conduct that looks like the way it would normally operate in a competitive environment, a losing party who gets run out of the market for whatever reason can just create an antitrust claim out of that purely innocent conduct standing alone. That's what the Supreme Court made very clear in Twombly. Brook Group emphasized, even before Twombly, and Twombly actually relied a little bit on Brook Group, Brook Group makes clear that those concerns are front and center in a predatory pricing claim. We want to encourage, not discourage, price competition. And that's all that's at issue here. Now, on that basis alone, with all due respect, this case is over because the predatory pricing claim is really the only anticompetitive conduct at the back of any of the claims at issue in this case. And without average below cost, without average, without below average variable cost pricing adequately alleged in this case, the predatory pricing claim fails as a matter of law. And, you know, I understand counsel said we don't have access to their, to Willamette's average variable cost. That's true. That's true. But they do have access. They did have enough facts about cost to allege the $10 competitive price. They certainly know their average variable cost. They could have talked about that. None of that's in the complaint either. All that's in the complaint, and this is why it's so implausible, all that's in the complaint is that they priced 30 percent above a profitable competing price and we came in and MarCO said we did better. And that was the end, and that was it. But the second element as well, as the district court went on, and I'll just touch on this briefly, also is absolutely not adequately pled here. It's not just... They did not allege that your client offered $10 or less, is that correct? They did not allege anything about the price that we ultimately, the specific price. They do allege, it is true, they have the conclusory allegation that our ultimate price is below cost. That's paragraph 40 in the complaint. But they didn't say it was below $10 or... Absolutely not. What they say is their profit margin cut off. That's right. And moreover, you know, it's absolutely clear that average variable costs in this context on this complaint has to be something meaningfully below $10. So, you know, when I talk about 30 percent above the profitable price, the actual, what it would actually take to have a predatory pricing claim would actually go significantly below that because, you know, average variable cost backs out fixed costs and overhead and profit. And here we know also that the price of patch, in paragraph 6, it's alleged that the price of patch includes things like the equipment that's provided to apply the patch. So there's just a huge gap here. And that, I think, is a big part of the problem. But in addition, on the second element of Brooke Group, the ability to recoup losses, the ability to maintain and sustain over a long enough period of time, super competitive pricing, super competitive profits, so that we can recover, recoup the investment, that also is basically implausible here. It's pled, and everything that's pled about this market that counsel talked about a moment ago actually cuts the other way. How quickly are there barriers to entry here? Well, let's look at what happened when we became, allegedly became the exclusive seller in 2000. Bates came in, was in the business nine months later. That's the complaint. And look what happened when EBPS's owner decided to come back in the market. If you look at paragraphs 30 and 32 of the complaint, it took less than a year, less than a year for him to have 10% of the market to get one of those product lines from Martco and to be invited to get 20% of the market by offering a better price. And not that long after, he's alleged that he passed a test with Hood. There's no reason to believe, zooming out from all of the specifics that they allege, which I'll get to in a minute, there's no reason to believe that the, that it's difficult or time-consuming or slow for a customer, for other sellers to enter this market. And when you look, it's, it is true, it is true that they allege a variety of specific costs of doing business. But it's absolutely clear this court made clear in Stern's aircraft, the Third Circuit, in ADVO is an excellent case on this point. The cost of doing business is not and cannot be barriers to entry. Legally significant barriers to entry are something more. They're more significant than just what's alleged here, which are things like designing and building equipment. Well, any manufacturer design, has to design and build equipment. Establish a supply chain. Again, that's the kind of cost that any manufacturer, if you're going to sell patch, you need a formula, you need to develop a formula for patch. These are just the costs of doing business. Even the APA, meeting APA standards, which is really just getting into the, into the manufacturing line and showing that your patch creates a sufficient quality grade material, is coming off the line, which is what they succeeded in doing with MARCCO, fairly quickly. Again, all of these things, these are not the kind of barriers to entry that are discussed in the cases, you know, federal regulations, high overhead, fixed overhead costs. All of these things delay entry and deter it. And none of that is present here. And if these kinds of things, if these kinds of costs, ordinary costs of doing business, are sufficient to meet the standard of barriers to entry, then the second element of Brook Group is functionality. It would essentially be this Court erasing the requirement that Brook Group put in place. And this, of course, the Court cannot do, and it's again referring, you know, zooming out, that element is there because it's important to ensure that the antitrust laws serve their purpose. As the Ninth Circuit explained in CFE years ago, the antitrust laws are not there to deal with circumstances where the market is built and structured in such a way that any kinds of untoward behavior by any party self-corrects. That's why barriers to entry are so significant. And here, the allegations are, when something happens, the market self-corrects. Look what MARCCO got. This is a very, very strange antitrust complaint. It's one where the plaintiff alleges that consumers have benefited from competition. It drove, competition drove prices down. MARCCO, the consumer about whom the most specific information is alleged, got exactly what it wanted out of this arrangement, a lower price over a long-term contract. Other customers, Hood and Coastal Plywood, are alleged to have received discounts too. In sum, there's no reason to believe in this complaint that Willamette had to resort, or did resort, to predatory pricing to win the business. And there's absolutely no reason to believe they could have profitably done so because of the low barriers to entry. In other words, it just won the business. In short, this is a common case in antitrust law, a case where competition worked for customers even though it didn't work for one of the competitors. The district court rightly dismissed the claim. Unless this Court has further questions, I respectfully request that you affirm the judgment. All right. Thank you, sir. The vote on Mr. Ward. Thank you. On a very brief reply, counsel talks about others penetrating the market. He mentions one firm other than Apps. And I think I get this case from the Ninth Circuit. We've cited where the market conditions, where the paltry entry into the market conditions of competitors is certainly something the Court takes into consideration as a part of the barriers to entry. We've alleged that in the last, what, 20, 30 years, I've lost track of time, 20 or 30 years, only two people have tried to get into this. They lasted about a year. And they were basically bought out. Which indicates they were successful. They were successful getting into it. They could. But two, in the whole United States, two companies in 20 years have competitors. That's highly, highly significant. And once they got in, they were immediately thwarted within a year. And the scheme that they ployed here, the way we've alleged it, is what they did, it's not just bundling the products that they discounted. They took products that this plywood manufacturer had to buy, and he's buying it from them, and said, look, we're going to discount, discount, discount, discount these four things. I can't tell you today how much that is. All I know is when my client gets there, he can't compete anymore. It's below $10. He can't do it. I can't swear to the court, I can't put in a pleading that theirs is $9.50, or it's $10, their average variable production cost. I'll find out if the court will give me a chance and come back and we'll say, it's $9.90. And when you consider these discounts, so we're selling it for $7. When he says, oh, it has to be 30% below $10, no. $10 is where my guy makes nothing. He starts making a dime at $10. I don't see the economic sense in discounting your prices on a whole bunch of other products long term. Well, we don't know what long term is. That was just a statement made by the company we were trying to do business with, and it was a phone conversation, and we put it in the complaint to be thorough. He said, no, no, I'm protected long term. But these people are already making profits at the place next door. This is only 10% or 20% of the market. They've got 100%. They could afford to, that's what I said, they could afford to give the patch to this guy and wait and then raise prices as they can. If it's a two-year deal or whatever, we were going to do a two-year deal. I don't know what long term is. We tried to have a contract for two years at $12.95. So what, and the guy says long term, maybe he'd be as long term. They could wait 10 years. They have 100% of the market. And at any point in time, they could say, well, look, what you going to do? We're going to raise it. Who are you going to go to? What if they sold it to him at $10.50 or $11? I mean, they're still making a profit. We don't know if that's what they did. They could have done that because your profit was 30%. Well, if you say I was 100% above $10, and maybe I should have been honest and put my client's baseline in there because I, you know, I haven't had an expert look at it. This is the client telling me I could do it for $10. I lose money after that. So I made those allegations. I know the people we're trying to sell to didn't come back to us and say, how about $10.50? How about just $10? It was over. They didn't want any dealings with us. They had cut a deal with these people because of all these discounts. The allegation is it had to be below what's competitive. It had to be below $10. Why wouldn't they have come back to me and says, okay, now I got them down to $10.50. Epps, what are you going to do? Well, because they could have sold it above their cost at $11, but discounted it, still making a profit on these other products. And the overall deal is good for the consumer. But I'm saying that the allegation is, Your Honor, which we all accept is true, is they discounted the other products significantly enough that where in reality, if you really take those discounts, patch is being sold way below their cost, way below their cost. I mean, if you don't believe the allegation, I understand that, but the court is bound to believe these allegations. Thank you, Your Honor, unless there's anything else, my red light. Thank you, Mr. Ward. Appreciate it. Mr. Hochman, thank you. Thank you, Judge.